AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Georgia

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

· 2022 MAR -8 ℗ 3 54

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

IN THE MATTER OF THE SEARCH OF:
33 Cypress Lane, Apartment 20, Alamo, Georgia 30411

)
)
)
)
)

Case No. 1:22-mj-19

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated by reference as if fully set forth herein.

located in the _____Southern_____ District of _____Georgia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated by reference as if fully set forth herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2251 | Attempted Production of Child Pornography |
| 18 U.S.C. 2422(b) | Persuade, induce, entice, and coerce a minor to engage in sexual criminal activity |

The application is based on these facts:

Please see the attached affidavit of Special Agent Marcus Kirkland, incorporated by reference as if fully set forth herein.

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Marcus Kirkland, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__video teleconference__ *(specify reliable electronic means)*.

Date: _____03/08/2022_____

_____
*Judge's signature*

City and state: _____Augusta, Georgia_____

Hon. Brian K. Epps, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

IN THE MATTER OF THE SEARCH
OF THE PREMISES LOCATED AT
**33 Cypress Lane, Apartment 20,
Alamo, Georgia 30411**

Case No.: 1:22-mj-19

**FILED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Marcus Kirkland, having been duly sworn, state as follows:

### AGENT INTRODUCTION AND BACKGROUND

1.     I have been employed as a Special Agent of the Federal Bureau of

Investigation (FBI) since September 1999, and I am currently assigned to the Atlanta

Division, Statesboro Resident Agency.   As a Federal Agent, I am authorized to

investigate violations of laws of the United States and to execute warrants issued

under the authority of the United States. As an FBI Special Agent, my duties include

investigating alleged violations of laws enforced by the FBI, including cases involving

the Sexual Exploitation of Children (SEOC). Since I have been in law enforcement, I

have gained valued experience in these types of investigations through training,

classes, and my everyday work. I have applied for and participated in numerous

search warrants in investigating violations relating to child exploitation and child

pornography, including the receipt, transportation, possession, and distribution of

child pornography, in violation of Title 18 U.S.C. §§2252 and 2252A.

2.     As a Special Agent, I am authorized to investigate violations of the laws

of the United States and to execute warrants issued under the authority of the United

States.  I know that Title 18, United States Code, Section 2252(a)(4)(B) prohibits a

1

person from possessing images of children engaged in sexually explicit conduct, as defined in Title 18 U.S.C. section 2256 ("child pornography"), Section 2252(a)(1) prohibits the transportation of child pornography, and Title 18 U.S.C. Section 2252(a)(2) prohibits the receipt and distribution of child pornography.

3.      I make this Affidavit in support of an Application for a warrant authorizing the search of a residence located at **33 Cypress Lane, Apartment 20, Alamo, Georgia 30411 (hereinafter, "TARGET PREMISES")**, as more particularly described in Attachment A of this affidavit, and any computers and electronic mobile devices and electronic storage media found therein.

4.      I submit this Affidavit based on information known to me personally from the investigation, as well as information obtained from others who have investigated the matter or have personal knowledge of the facts herein. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, it does not include every fact known to me about this matter.

5.      Based on the information set forth in this affidavit, there is probable cause to believe that at the **TARGET PREMISES**, more fully described in Attachment A, contains evidence of a crime, contraband, other items illegally possessed, or fruits of a crime, that is, violations of Title 18, United States Code, Sections 2251 (attempted production of child pornography) and 2422(b) (persuade, induce, entice, and coerce a minor to engage in sexual criminal activity).

## PROBABLE CAUSE

### *RIVERS Initiates Conversation with an FBI Agent Acting in an Undercover Capacity, Posing as a Child*

6.      On or about December 17, 2021, an FBI employee acting in an undercover capacity (Online Covert Employee, hereafter "OCE #1"), in the Southern District of Florida, was contacted on a social media platform by user, "zayzaye2323", vanity name Xavier Wilson.[1] As outlined below, Xavier Wilson has been identified as Xavier Rivers ("RIVERS"). OCE #1 first observed this user in a group (hereafter referred to as "GROUP") on a social media platform, which focuses on like-minded individuals who post and/or share to receive videos and images of pornographic nature, including child pornography.  Upon joining the GROUP, the user receives the following message: "state your age, daughters age, and if you are active with her or not upon entering, if you join and don't say a word you will be removed".

7.      In the GROUP, OCE #1 identified herself as being 11 years old.  On or about December 17, 2021, in a direct message to OCE #1, RIVERS initiated conversation by asking OCE #1 how old she was, and what grade she was in. OCE #1 indicated that she was "11" and in the 5th grade. RIVERS responded with, "Do you like black guys" and "can I fuck you".  During this conversation, RIVERS stated to OCE #1, "I wanna help you have sex".

8.      In the same conversation, on or about December 17, 2021, RIVERS asked OCE #1 for a picture of herself and subsequently provided a photograph of

---

[1] Law enforcement confirmed that this is a fake name.

3

himself. OCE #1 sent a picture to RIVERS which portrayed OCE #1 as a young child hugging a dog.[2]

9.    On or about December 20, 2021, RIVERS was engaged in another conversation with OCE #1 wherein he identified himself as "Xavier," and informed OCE #1 that he is 29 years old. On the same day, RIVERS began to engage OCE #1 in a sexually explicit conversation. For example, RIVERS advised OCE #1 that he wanted to "lick [her] pussy suck on [her] pussy", and "put [his] dick in [her] mouth". OCE #1 asked if she would receive a reward for this, to which RIVERS sent her a photograph of an erect penis.

10.    During a conversation that took place on or about January 3, 2022, RIVERS informed OCE #1 that he was going to perform oral sex on her, asked OCE #1 to get naked, told OCE #1 that he wanted her to touch herself on her vagina, and told OCE #1 that he wanted her to think of him having intercourse with her.

11.    Additionally, on or about January 3, 2022, RIVERS asked OCE #1 if she wanted RIVERS to get her pregnant. OCE #1 inquired as to how that was possible since she was only 11 years old, to which RIVERS indicated that he would have intercourse with her. RIVERS also asked OCE #1 if she would like RIVERS to make her a mother by impregnating her.

12.    On the same day, on or about January 3, 2022, RIVERS engaged in a conversation with OCE #1 whereupon he requested that OCE #1 record herself conducting a sexually explicit activity. For example, RIVERS asked OCE #1 to put

---

[2] This image was digitally processed by the FBI.

the handle of a brush inside of her vagina and asked her to use her camera to show him. RIVERS then instructed OCE #1 as to how to take a video, using her camera. RIVERS provided OCE #1 with instructions of what she was to do on video, which included calling him "big daddy" and moaning, "till the video stop". In exchange, RIVERS sent a video of himself masturbating.

### RIVERS Engages in Contact with an FBI Undercover Agent Posing as OCE #1's Father

13.    On or about January 3, 2022, RIVERS engaged in conversation with another OCE (OCE #2), acting in an undercover capacity as OCE #1's father.  During that conversation, OCE #2 disclosed to RIVERS that his "daughter" (OCE #1), is 11 years old and that he is sexually active with her.  RIVERS told OCE #2 that he is 29 years old and expressed a desire to be OCE #1's boyfriend.  OCE #2 asked RIVERS, "She said you wanted her to send you some pics or movies of her?"  RIVERS replied, "I thought that would be hot to see if only she wants to" and "it would be hot messaging her while you fucking her."  OCE #2 asked RIVERS what he wanted to see, to which RIVERS replied, "her getting fuck and her pussy."

14.    During a conversation that took place on or about January 22, 2022, RIVERS and OCE #2 discuss OCE #2 producing child pornography of OCE #1, in exchange for RIVERS paying OCE #2. For example, RIVERS offered to pay OCE #2 $20 for a photograph of OCE #1 laying on her back, with her legs spread, while naked. RIVERS then paid OCE #2 $20, via CashApp, for the photograph. OCE #2 sent a photograph which was intentionally corrupted by law enforcement, and which

5

RIVERS attempted to open numerous times. OCE #2 received a CashApp notification from the name, "XAVIER RIVERS", with the CashApp user ID, "$xaga2323" for $20, as agreed upon.

### *Law Enforcement Identifies RIVERS*

15.    During several conversations with OCE #1, RIVERS provided his phone number as 912-423-2362. It was determined that this number was associated with AT&T. Pursuant to an administrative subpoena, results from AT&T confirmed that the subscriber to the number is "Xavier Rivers", with an address of "57 E Lucille Avenue, Alamo, Georgia, 30411". The records also revealed that the account was activated in 2018.

16.    An open-source query for "Xavier Rivers" at "57 E Lucille Ave, Alamo, Georgia 30411" was conducted, which confirmed that "Xavier M. Rivers", with an accompanying date of birth of ███████████ was associated with the listed address of "57 E Lucille Ave 3, Alamo, GA 30411".

17.    A query of the State of Georgia Driver's License database yielded a result for Xavier Marquel Rivers. This database provided a photograph of Xavier Marquel Rivers, which law enforcement confirmed depicted the same individual as the individual in the photographs that RIVERS sent to OCE #1 of himself.

18.    On or about January 5, 2022, during a conversation with RIVERS, OCE #1 requested pictures of RIVERS blowing her a kiss and making a heart symbol with his hands. RIVERS complied with OCE #1's request and sent OCE #1 photographs of

himself doing the aforementioned poses. Law enforcement confirmed that the individual in the photographs was RIVERS.

19.     On or about January 6, 2022, RIVERS also advised OCE #1 that his birthday is on July 23rd. This birth date is consistent with information your Affiant had received when querying public and law enforcement data systems.

20.     On or about January 6, 2022, during a conversation with OCE #1, RIVERS informed OCE #1 that he has a laptop and a Samsung cellular phone. RIVERS informed OCE #1 that he was communicating with her on the Samsung phone.

21.     On or about January 10, 2022, pursuant to OCE #1's request in which OCE #1 advised that she made a present for RIVERS and wanted to ship it to him, RIVERS told OCE #1 that he was residing at 112 Tyre Drive, McDonough, Georgia 30253.

22.     On or about January 20, 2022, records were received from AT&T pursuant to an administrative subpoena for IP Address 45.18.187.10 ("Target IP Address"), which was associated with the social media platform coming from RIVERS' account. The records confirmed that the account, created in 2019, associated with the Target IP Address since 2019, is "██████████"[3] and has an accompanying address of 112 Tyre Drive, McDonough, Georgia 30253-8540.

23.     On or about February 25, 2022, RIVERS filed a police report wherein he indicated that he was residing at 165 Spaulding Drive, McRae, GA 31055. Following

---

[3] An investigation revealed that "████████" is RIVERS' aunt.

the police report filed by RIVERS, a detective made contact with RIVERS, at which point RIVERS confirmed he was residing at 165 Spaulding Drive, McRae, GA 31055 and provided the detective with directions to 165 Spaulding Drive, McRae, GA 31055.

24.     On February 25, 2022, Police Chief Glenn Giles observed RIVERS arrive and depart the McRea-Helena Police Department parking lot operating a silver-colored Toyota Corolla bearing Georgia license: RNJ-9071. Giles has observed RIVERS operating the same vehicle at various other times in and around the McRae-Helena area.

25.     On March 3, 2022, Giancarlos Mancini, Wheeler County Sheriff's Office, Alamo, Georgia observed RIVERS' Toyota Corolla bearing Georgia license: RNJ-9071 parked at the residence of Mikia Edwards, **33 Cypress Lane, Apartment 20, Alamo, Georgia**, the **TARGET PREMISES**.

26.     On or about March 4, 2022, RIVERS—who is still corresponding with OCE #2—informed OCE #2 that he was living in McRae, Georgia.

27.     RIVERS and Edwards have a familial relationship as their mothers are believed to be related. Mancini has observed RIVERS' vehicle parked during the early morning hours at the **TARGET PREMISES** on March 4, 2022, March 7, 2022, and March 8, 2022. Mancini has observed RIVERS operating the same vehicle at various other times in and around the Alamo area.

28.     Based on conversations with the Assistant Superintendent of Schools and his familiarity with the RIVERS family, Mancini believes that RIVERS is living at both his mother's home in McRae and his cousin's home in Alamo.

29.     RIVERS has also told Mancini that he is working for the Wheeler County Parks and Recreation Department in Alamo, Georgia.  Mancini has observed RIVERS, dressed in his uniform utilized for refereeing youth softball games, at the parks and recreation facility in Alamo.

## CHARACTERISTICS OF CHILD PORNOGRAPHERS

30.     Based upon my knowledge, experience, and training in child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to many individuals involved in such crimes:

a.  Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.  Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.   Such individuals oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.  Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child-pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home, or in some other secure location.

d.  Likewise, those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.

e.  Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes also may correspond with others to share information and materials.

## TECHNICAL TERMS

31.     Based on my training and experience, I use the following technical terms

to convey the following meanings:

a.  IP Address: IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses. There are two commonly used types of IP addresses called IPv4 and IPv6. IPv4, or IP version 4, is a 32-bit numeric address that consists of a series of four numbers, each ranging between 0 and 255, that are separated by dots. An example of an IPv4 address is 123.111.123.111. IPv6, or IP version 6, is a 128-bit hexadecimal address that consists of a series of eight values separated by colons. Hexadecimal values consist of a series of numbers between 0 and 9 and letters between A and F. An example of an IPv6 address is: 3ffe:1900:4545:3:200:f8ff:fe21:67cf.

b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.  Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM,

10

floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

d. "Child Pornography" includes any visual depiction, including any photograph, film, video, picture, or computer or computer generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct where (A) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (B) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (C) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. *See* 18 U.S.C. § 2256(8).

e. "Minor" means any person under the age of 18 years. *See* 18 U.S.C. § 2256(1).

f. "Sexually explicit conduct" applies to visual depictions that involve the use of a minor, *see* 18 U.S.C. § 2256(8)(A), or that have been created, adapted, or modified to appear to depict an identifiable minor, *see* 18 U.S.C. § 2256(8)(C). In those contexts, the term refers to actual or simulated sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic areas of any person. *See* 18 U.S.C. § 2256(2)(A).

g. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

32. As described above and in Attachment B, this Application seeks permission to search for records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied

11

for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33.     *Probable cause.* I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have spoken, I know the following about computers and computer technology:

i. Computers, computer technology, and the Internet have revolutionized the manner in which child pornography is produced and distributed.  Basically, computers serve five functions in connection with child pornography:  production, communication, distribution, storage, and social networking.

ii.   With digital cameras, images of child pornography can be transferred directly onto a computer.  A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Through the Internet, electronic contact can be made to literally millions of computers around the world.

iii. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store many thousands of images at very high resolution.

iv. The Internet affords individuals several different venues for meeting each other, obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. Individuals also use online resources to retrieve and store child pornography such as email services and cloud storage. A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

34.   *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. I believe there is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.   In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device

connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to view or share child pornography the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal

15

conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

35.     *Necessity of seizing or copying entire computers or storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

36.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

37.  Because several people share the Subject Premises as a residence, it is possible the Subject Premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

38.  I am aware that many computers and electronic storage devices today, such as laptop computers, tablets, telephones, external drives and thumb drives, are portable.  I also know from my training and experience that these devices are often stored in vehicles to prevent other users in the home from discovering the existence of the child pornography collection.  Therefore, this application seeks permission to search vehicles located at or near the premises that fall under the dominion and

control of the person or persons associated with said premises.  The search of these vehicles is to include all internal and external compartments and all containers that may be associated with the storage of child pornographic materials or their instrumentalities contained within the aforementioned vehicles.

## CONCLUSION

Based on the aforementioned facts, I respectfully submit that probable cause exists to believe that the **TARGET PREMISES**, located at **33 Cypress Lane, Apartment 20, Alamo, Georgia,** as more fully described in Attachment a, contains fruits, instrumentalities, and evidence of  violations of Title 18, United States Code, Sections 2251 (attempted production of child pornography) and 2422(b) (persuade, induce, entice, and coerce a minor to engage in sexual criminal activity), including in the computers, electronic mobile devices, and electronic storage media therein.

Respectfully submitted,

Marcus Kirkland
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 via reliable electronic means on this 8th day of March 2022.

HONORABLE BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

## ATTACHMENT A

### *Property to be Searched*

The property to be searched is **33 Cypress Lane, Apartment 20, Alamo, Georgia 30411 ("TARGET PREMISES")**, and in the computers, electronic mobile devices, and electronic storage media therein. The TARGET PREMISES is a red bricked, single family dwelling home, with three dark colored windows affixed to the front of the property. The TARGET PREMISES has a brown shingled roof and screened door on its porch. The numbers, "20" are affixed to the right of the TARGET PREMISES' front door. Photographs of the TARGET PREMISES' exterior are below:









## ATTACHMENT B

### *Description of Items to be Seized and Searched*

1.     All records, including those stored digitally, pertaining to violations of Title 18, United States Code, Sections 2251 (attempted production of child pornography) and 2422(b) (persuade, induce, entice, and coerce a minor to engage in sexual criminal activity), and in the computers, electronic mobile devices, and electronic storage media therein, including:

    a.  Records and information relating to images or videos of suspected child pornography;

    b.  Records and information relating to communications between individuals about child pornography;

    c.  Records and information relating to the existence of sites on the internet that contain child pornography or that cater to those with an interest in child pornography;

    d.  Records and information relating to membership in online groups, clubs, or services that provide or make accessible child pornography to members;

    e.  Records and information relating to any e-mail accounts used to view, access, trade or distribute child pornography;

    f.  Records and information relating to communications with Internet Protocol addresses 2601:100:857f:6910:C125:9762:B96:3527;

4

g. Records and information relating to malicious software.

2.    Computers or storage media used as a means to commit the violations described above.

3.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

5

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

4.     Routers, modems, and network equipment used to connect computers to the Internet.

6

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.